Coan, Payton & Payne, LLC
Fritz W. Ganz, Ariz. Bar No. 028990
999 18th Street
South Tower | Suite 1500S
Denver, Colorado 80202
Phone: (303) 861-8888
Email: fganz@cp2law.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| **Brian Sorensen**, a Colorado resident; and | ) | Civil Action No. _____ |
| | ) | |
| **Mile High Restoration Inc.**, a Colorado corporation, | ) | **VERIFIED COMPLAINT** |
| | ) | |
| Plaintiffs, | ) | (Breach of Contract and Other Relief) |
| | ) | |
| v. | ) | and |
| | ) | |
| **Restoration Builders, Inc.**, an Arizona corporation; and | ) | **JURY DEMAND** |
| | ) | |
| **Restoration Builders Holding Company, LLC**), an Arizona limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs Brian Sorensen and Mile High Restoration Inc. d/b/a Sorensen Roofing & Exteriors, G.C. ("Sorensen Roofing"), (collectively "Plaintiffs"), by and through undersigned counsel, Coan, Payton & Payne, LLC, hereby respectfully submits the following Verified Complaint and Jury Demand, and in support thereof, states and alleges as follows:

## INTRODUCTION

1.      Plaintiffs and Defendant Restoration Builders, Inc., f/k/a Property Restoration Company, Inc. ("RBI") entered into an Asset Purchase Agreement dated June 25, 2019 (the "Agreement") whereby, in general terms, Sorensen Roofing was to contribute substantially all its assets to Defendant RBI in exchange for an equity interest in RBI and salaried employment for Mr. Sorensen with RBI. **Exhibit 1**, Agreement.  The Agreement was amended by a Contribution Agreement and Amendment to Asset Purchase Agreement dated September 30, 2019 (the "Amendment") (together, the "Amended Agreement"), whereby the Agreement was converted to a contribution agreement with the assets of Sorensen Roofing contributed to Defendant and Restoration Builders Holding Company, LLC ("RBH") in exchange for an equity interest in RBH. **Exhibit 2**, Amendment.[1]

2.      This action arises from Defendants' concerted and intentional actions, including various breaches of contract and tortious conduct, which actions were undertaken for corporate gains which directly and proximately caused Plaintiffs damages. As set forth in greater detail below, Defendants are liable for these damages suffered by Plaintiffs.

---

[1] The attached Exhibits 1 and 2 are the most complete copies of the Agreement and Amendment in Plaintiffs' possession or control.  Upon information and belief, complete copies of the Agreement and Amendment are in the possession and control of Defendants.

## THE PARTIES

3.      Plaintiff Sorensen Roofing is a Colorado corporation doing business in northern Colorado and Wyoming and had a principal street address of 5990 West 10th Street, Greeley, Colorado 80634.

4.      Plaintiff Brian Sorensen is a Colorado resident with a principal street address of 5937 West 4th Street, Greeley, Colorado 80634.

5.      Upon information and belief, Defendant RBI, is an Arizona corporation with a principal street address of 3961 East Chandler Blvd., Suite 111-168, Phoenix, Arizona 85048.

6.      Upon information and belief, Defendant RBH is an Arizona limited liability company with a principal street address of 3961 East Chandler Blvd., Suite 111-168, Phoenix, Arizona 85048.

## JURISDICTION AND VENUE

7.      Pursuant Section 13.12 of the Agreement, the Parties consented to jurisdiction (personal and subject matter) and venue in the state and federal courts serving Maricopa County, Arizona for any legal action between the Parties.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 due to diversity of citizenship and an amount in controversy in excess of $75,000, exclusive of interest and costs.

9.      All conditions precedent to the filing of this action have been performed, have occurred, are futile, or have otherwise been waived.

## GENERAL ALLEGATIONS

10.     Opening in 2012, Sorensen Roofing was primarily engaged in the construction and repair of residential and commercial roofing, siding, and building exteriors.

11.     Sorensen Roofing grew into a successful business completing approximately 680 contracts per year with annual revenue of approximately $9,200,000.

12.     On or about March 15, 2019, Mr. Sorensen was approached by principals of RBI with a proposal for RBI to consolidate 13 roofing companies nationwide to create a single corporation.

13.     The primary advantages touted by RBI would be mitigation of business risks due to geographic diversity and shared operating expenses.

14.     On or about June 25, 2019, the Parties entered into the Agreement whereby Sorensen Roofing would sell to RBI, then known as Property Restoration Company, Inc., its business and substantially all of its assets and properties.

15.     The purchase price, derived from Sorensen Roofing's earnings before interest, taxes, depreciation, and amortization (EBITDA), included the issuance of 1,342,000 shares of RBI stock to Mile High Restoration Inc.

16.     Prior to closing, RBI was to enter into a new lease for Sorensen Roofing's headquarters.  Sorensen Roofing's lease had ten months remaining on its term.

17.     Dan Windnagle, Mike Iovieno, John Lorenz, Mike Flores, and Heath Hicks took part in the negotiation of Agreement on behalf of RBI.

18.     Mr. Sorensen was the Seller's Principal negotiator on behalf of Sorensen Roofing.

19.     On or about September 30, 2019, following a restructuring of RBI into a holding company structure under RBH, the Parties entered into the Amendment.

20.     While the Agreement remained in effect, in substantial entirety, the Amendment converted the sale of Sorensen Roofing's business and assets to a capital contribution to RBI and the Purchase Price was amended to a membership interest of 1,342,000 units of RBH in lieu of 1,342,000 shares of stock in RBI.

21.     On January 24, 2020, RBI held a rollout event with investors in Dallas, Texas.

22.     Sorensen Roofing was instructed to send as many of its employees as possible to attend the event.

23.     Mr. Sorensen advanced all expenses for the team's travel.

24.     The RBI rollout preceded the International Roofing Expo (IRE) and Sorensen Roofing was again requested to make a strong showing.

25.     Again, Mr. Sorensen advanced all expenses associated with the Sorensen Roofing team's attendance at IRE.

26.     Mr. Sorensen reasonably expected the expenses associated with Sorensen Roofing's attendance at these functions would be reimbursed by RBI.

27.     From February 29 through March 5, 2020, Sorensen Roofing traveled to Tyler, Texas to attend training mandated by RBI.  Once again, Mr. Sorensen advanced all

travel expenses for the team with the reasonable expectation he would be reimbursed by RBI.

28.     AVCO was to assume charge of all training activities – production, supplement and marketing – as they were directed to consolidate all offices in the Southwest Region under their structure.  AVCO's systems and training programs were wildly different from those Sorensen Roofing had worked years to put in place.  This transition, done at the direction of RBI, meant a major culture shift for Sorensen Roofing.

29.     During the final day of the training, Mr. Sorensen traveled to Austin to attend a separate training while the rest of the Sorensen Roofing team completed the training in Tyler.

30.     Upon returning to Colorado, Mr. Sorensen was confronted with a workforce who was concerned and dissatisfied with the transition of Sorensen Roofing to RBI.  There was widespread distrust in RBI and, by extension, Mr. Sorensen.

31.     Concerned about mass resignations among his personnel, Mr. Sorensen emailed RBI's CEO and COO expressing a desire to withdraw from the transaction with RBI and terminate the Amended Agreement.  RBI replied, stating their gratitude for the contributions of Sorensen Roofing and disappointment that Sorensen Roofing would be withdrawing from RBI.

32.     When the COVID pandemic precipitated widespread shutdown, Mr. Sorensen contacted RBI to obtain the necessary financial information to complete Sorensen Roofing's application for PPP loans.  RBI's financial and accounting services replied that this would be impossible to provide as all financial and accounting data was

commingled across RBI's regional operations. Sorensen Roofing was left without the ability to apply for needed PPP loans.

33.     Instead, Sorensen Roofing was compelled to apply for a bridge loan from Kapitus Lending to buy time while it sought from RBI its financial and accounting information.

34.     On April 23, 2020, Mr. Sorensen was notified that Misty Krebs, his Vice President of Operations resigned, deleted her email accounts, and disposed of all training files, systems and processes developed by Sorensen Roofing over the preceding four years. The resignations of Sorensen Roofing's production manager, supplement manager, and entire sales team followed. Upon information and belief, these employee resignations and disruptions to the operations of Sorensen Roofing were a direct and proximate result of RBI's conduct in the transition.

35.     Mr. Sorensen immediately called Mr. Iovieno to inform him of the resignations. Mr. Iovieno stated that RBI wanted Sorensen Roofing to remain with RBI; if they could have any company back in the fold, they wanted it to be Sorensen Roofing, according to Mr. Iovieno.

36.     From Mr. Sorensen's perspective, this was not a surprise; while in Tyler, Texas, Mr. Sorensen met with Mr. Iovieno for approximately three hours, during which Mr. Iovieno expressed his desire that Mr. Sorensen join RBI's corporate team.

37.     During this same April 23, 2020 call, Messrs. Iovieno and Lorenz jointly expressed RBI's desire for Sorensen Roofing to remain at RBI. They stated that no paperwork had been executed so the original agreements for RBI's acquisition of

Sorensen Roofing were "in full force." On behalf of RBI, they induced Mr. Sorensen and Sorensen Roofing to continue to perform under the Amended Agreement and represented that everything would return to as it was before Sorensen Roofing indicated its intent to terminate the Amended Agreement. Induced by RBI's promises of performance under the Amended Agreement, Mr. Sorensen agreed that Sorensen Roofing would remain with RBI.

38.     Finally, Mr. Iovieno informed Mr. Sorensen on April 23, 2020, that Misty Krebs had started her own roofing company approximately one month prior to resigning from Sorensen Roofing. Upon information and belief, she took countless files and customers belonging to Sorensen Roofing, including a pipeline of projects carrying potential sales of $1.5M. RBI, fully aware of Ms. Krebs' actions, failed or refused to take any action against her or and made no attempt to retrieve Sorensen Roofing's stolen files and business opportunity.

39.     Having agreed to remain with RBI, Mr. Sorensen contacted Dan Windnagle regarding the outstanding Kapitus bridge loan Sorensen Roofing had taken as a stop-gap while RBI applied for PPP loans. Mr. Sorensen asked if Sorensen Roofing should pay off the Kapitus loan since RBI had acquired the PPP loans. Mr. Windnagle induced Mr. Sorensen to maintain the loan.

40.     Sorensen Roofing ended up using the full amount of the Kapitus loan for overhead through the summer of 2020. RBI stopped making payments on the Kapitus loan in December 2021 with a balance outstanding of approximately $14,000 and the

lender is pursuing Mr. Sorensen for default.  The current payoff amount for the Kapitus is not known.

41.     Mr. Sorensen began to rebuild Sorensen Roofing and continued the integration of its business operations with RBI's framework, in further performance under the Amended Agreement.  Mr. Sorensen spent much of his time focused on assisting RBI with the identification of additional acquisition targets and implementing various corporate operational elements RBI had planned for its national portfolio of companies.  These duties took Mr. Sorensen away from the day-to-day operations of Sorensen Roofing, starting in June 2020.

42.     As he worked to rebuild Sorensen Roofing, Mr. Sorensen learned Sorensen Roofing was in financial disarray.  Due to invoicing errors the company took a loss of approximately $135,000 in 2019 despite completed jobs totaling nearly $9M.

43.     As Mr. Sorensen further reviewed the prior year's operations, he discovered additional facts that shed light on the recent resignations of most of Sorensen Roofing's employees.  He informed Messrs. Windnagle and Iovieno of his findings and asked them to investigate a possible civil conspiracy against Mr. Sorensen and Sorensen Roofing. The response: "Not right now, we have bigger things to take care of."  They said we would wait until Ms. Krebs' company, Valcore Roofing and Exteriors, LLC ("Valcore"), grew so there would be more to recover as Valcore would be worth more after a year or two.  Upon information and belief, RBI has not done anything to pursue the investigation or potential legal action against Ms. Krebs or Valcore.

44.     On May 28, 2020, Mr. Sorensen sent RBI a detailed account of his review of Sorensen Roofing's operations and current financial condition.  Outstanding debt to ABC Supply and other business expenses advanced by Mr. Sorensen totaled more than $119,000.  Relationships with Sorensen Roofing's suppliers were strained.  The remaining workforce was outstretched.  Sorensen Roofing needed help.  RBI's response: "Keep doing what you are doing, we know 2020 is a loss, but keep building and growing for 2021."

45.     With regard to the outstanding balance owing to ABC Supply, Mr. Iovieno told Mr. Sorensen to maintain the status quo.  If ABC Supply took legal action, RBI would have its attorneys stall until after RBI went public, at which time they would bring the account current.  RBI was apparently in a similar position with Beacon Roofing in Indiana and took the same course of action.

46.     These acts and omissions on the part of RBI, and RBI's inducement of Mr. Sorensen to maintain the status quo, caused irreparable harm to the business, professional, and personal reputations of Sorensen Roofing and Mr. Sorensen.

47.     Looking to get Sorensen Roofing back on track, Mr. Sorensen set about planning for the upcoming storm season.  Over the course of more than four years, Sorensen Roofing had become a leading in leveraging social media to develop sales through its website with Marketing360/MadWire.  Web-based marketing accounted for 90% of Sorensen Roofing's revenue.

48.     In early June 2020, Janet Lorenz, wife of RBI CEO John Lorenz, contacted Mr. Sorensen and, at the direction of RBI, induced him to transition all social media and

web-based marketing over to her company, Market Tactics, and RBI.  A purported clone of Sorensen Roofing's website had been created and RBI stated it was exactly the same as the Marketing360/MadWire site.  The new website transferred a mere 12 pages of content from the 112 pages of Sorensen Roofing's content. The plan was to transfer everything over to the new platform.  Sorensen Roofing would not miss a beat, according to RBI.  RBI promised Sorensen Roofing's Google ranking, search engine optimization (SEO), and lead funnels – perfected over the prior three years through Plaintiffs' proprietary systems – would remain unchanged.

49.     These representations were not only false, Ms. Lorenz and RBI knew or should have known they were false.

50.     After the transition to RBI's website, Sorensen Roofing's dropped from the top Google ranking to page seven in the search results.  After a hailstorm hit Greeley, Colorado, Sorensen Roofing did not receive a single phone call.  The same was true following storms in Cheyenne, Wyoming, and Elbert, Colorado.

51.     Mr. Sorensen learned a month later the marketing materials were using the incorrect phone number for Sorensen Roofing, using instead an old tracking phone number from Marketing360/MadWire.  The use of tracking phone numbers is standard industry practice so the ad spend can be tied to lead generation.  RBI and Market Tactics either intentionally or negligently failed to exercise due care to ensure Sorensen Roofing's advertising spend would be tied to functioning phone numbers.

52.     Before joining RBI, Sorensen Roofing's social media campaigns generated an average of over 1,600 lead conversions, a rate of approximately 37%.  This accounted

for approximately 680 jobs with an average contract price of $13,500 generating $9.2M in annual revenue.  These statistics were all tracked and recorded, backed by data.

53.     The botched transition from Marketing360/MadWire, at the hands of RBI, Market Tactics, and Ms. Sison, had an immediate impact on the viability of Sorensen Roofing, already reeling from the pandemic and employee attrition caused in part by RBI.

54.     These acts and omissions on the part of RBI, and RBI's inducement of Mr. Sorensen to transition Sorensen Roofing's marketing and social media to Market Tactics and RBI, caused damages and irreparable harm to the business, professional, and personal reputations of Sorensen Roofing and Mr. Sorensen.

55.     In July 2020, Sorensen Roofing hired Cory Crandall out of retirement to take over as Sales Manager.  RBI's directive to "build for 2021" meant Sorensen Roofing had to build a culture and foundation first, then scale up.

56.     RBI required Mr. Sorensen and Mr. Crandall to travel to Dallas, Texas for mandatory training with the rest of the remaining RBI members in the Southwest Region. Messrs. Flores and Iovieno also attended the training.  During the training event, it became clear to Mr. Crandall, as it had to Mr. Sorensen, that RBI was not fulfilling its commitment to streamline operations across its member companies.  Instead, there remained redundant accounting, production, supplementing, and training programs.  The system was not structured to be profitable; RBI was failing to take advantage of the economies of scale it touted to induce member companies, including Sorensen Roofing, to join.

57.     During the Dallas event, Messrs. Crandall and Sorensen approached Mr. Iovieno to discuss the state of Sorensen Roofing's operations.  Sorensen Roofing was strapped for cash and it needed to grow.  Mr. Iovieno told them RBI would "figure it out" and told them to keep building for 2021.  Sorensen Roofing had been offered a contract with ServPro to enter the Iowa market following a large wind and tornado event but RBI told them to focus on Colorado and build for 2021.  Messrs. Crandall and Sorensen complied with these directives from RBI.

58.     Entering September 2020, as a result of complying with RBI's management directives, Mr. Sorensen was financially unable to continue supporting Sorensen Roofing. He went without a paycheck for several months, his credit cards were at their limits, and ABC Supply threatened to sue.  Mr. Sorensen considered filing for bankruptcy or selling his home.  After discussing the situation with Mr. Iovieno, Mr. Iovieno induced Mr. Sorensen to liquidate a portion of his interest in RBI to keep himself and Sorensen Roofing afloat.

59.     As a result, Mr. Crandall agreed to purchase 310,000 shares (or units) of Mr. Sorensen's interest for $250,000.  Of the proceeds from this transaction, $90,000 went directly back into Sorensen Roofing and Mr. Sorensen personally covered $14,000 in losses associated with roofing jobs relating to manufacturer claims that required replacements of roofs prior to claim resolution.

60.     During this financial hardship on Mr. Sorensen, RBI was doing what it could to inflate its EBITDA.  As a part of that self-serving effort, Mr. Iovieno directed Mr. Sorensen to use the $90,000 from the Crandall transaction to pay company expenses,

but to keep Mr. Sorensen's contribution off the books, thus inflating RBI's EBITDA. Mr. Sorensen was advised that if he refused to make the off-the-books cash infusion he would be terminated and no longer a part of RBI.

61.     In October, Mr. Iovieno demanded that Mr. Sorensen step down as managing director and take over the sales manager role.  Citing underperforming financials, Mr. Iovieno told Mr. Sorensen the only way RBI can keep him on is if he would agree to the demotion to sales manager and agree to a merger with Minnesota-based Built Strong Exteriors.  Mr. Iovieno informed Mr. Sorensen this merger would make the collective books of RBI and its member companies look better financially, which is all that is important to RBI.

62.     With no other option, Mr. Sorensen agreed to the demotion and the merger. Only after agreeing to this arrangement did Mr. Sorensen learn from Mr. Windnagle that the books of member companies – including Sorensen Roofing and Built Strong Exteriors – would remain separate and operate as a "franchisee model."  This is directly counter to the consolidation that was to occur under the terms of the Amended Agreement.

63.     As Built Strong Exteriors began to absorb Sorensen Roofing, the business model changed dramatically. Door-knocking would be the only source of leads.  Mr. Sorensen made every effort to perform in his new role as sales manager and implement this new business model at the direction of RBI and Built Strong Exteriors.  Despite those efforts, it became clear to Mr. Sorensen they needed to hire sales manager who could succeed in a canvass-based sales model.  This decision was also made because Mr. Sorensen was not being paid for his role as sales manager.  He was still personally

advancing Sorensen Roofing's overhead, materials costs, and marketing at RBI's inducement and direction.

64.     On the day after Thanksgiving 2020, Mr. Sorensen spoke to RBI regarding his decision to step down from the sales manager role and hire someone who could succeed in a canvass-based system.  He remained invested in building RBI and was willing to sacrifice for the greater good of the company.

65.     Looking to find a role in which he could contribute to RBI's success and growth, Mr. Sorensen expressed a desire to assume a role in a broad range of areas including brand equity building, community involvement, customer and business relations, or marketing.  He was told there were no positions available in these areas. With few options before him, Mr. Sorensen expressed a desire to sell his remaining interest in RBI.

66.     The following Monday, Mr. Flattum sent Mr. Sorensen a text message, inviting Mr. Sorensen to a Zoom meeting with RBI's management, Messrs. Iovieno, Flores and Flattum.  During the meeting, RBI informed Mr. Sorensen he was being suspended, effective immediately, and instructed him to turn over his keys to the office. There was no paperwork, no notice, and no payment of back pay.  In desperation, Mr. Sorensen asked about the possibility of staying on as part of the sales team.  They responded that it would cause too many problems with the existing sales team.

67.     RBI has failed to perform under its contract obligations under the Amended Agreement.  RBI induced Mr. Sorensen to incur substantial expenses in furtherance of its performance while RBI systematically dismantled Sorensen Roofing without payment or

any consideration.  The promised shares or membership units in RBI have never, to Mr. Sorensen's knowledge, been issued.  Documentation of Mr. Sorensen's membership interest in RBI has never been delivered.  This is particularly problematic as Mr. Sorensen conveyed a portion of that interest to Cory Crandall, a transaction arranged by RBI in its own interest.

68.     In further breach of its various contractual obligations, RBI never entered into a new lease for Sorensen Roofing's offices.  Failure to do so left Mr. Sorensen and Sorensen Roofing liable for the existing lease without access to the business revenue or operational control which had been transferred to RBI.

69.     RBI induced Sorensen Roofing into procuring the Kapitus bridge loan while misappropriating PPP loans taken against Sorensen Roofing's operations.  RBI then failed to repay the Kapitus loan, which funds were used to cover operational expenses of Sorensen Roofing for the benefit of RBI.  As a result of RBI's default, Mr. Sorensen is being pursued for repayment of more than $14,000 spent to further RBI's business interests to his personal detriment.

70.     To comply with RBI's demands, Mr. Sorensen advanced sums in excess of $80,000 for travel, materials, subscriptions, and training events.  He used $15,000 of the proceeds of the sale of a portion of his membership interest to Mr. Crandall to cover the replacement costs for two GAF roofs that blew off; GAF later paid RBI for these roofs but RBI did not reimburse Mr. Sorensen.

71.     Based on overestimates of 2020 gross sales, Mr. Sorensen paid $70,000 in excess premiums for general liability coverage.  The reduction in gross sales was a direct

and proximate result of RBI's botched website transfer and the disruption and ultimate elimination of Sorensen Roofing's web-based marketing during the Colorado storm season.

72.     Among the operational expenses advanced by and owing to Mr. Sorensen is $55,000 for merchandise and marketing materials RBI ultimately disposed of after Built Strong Exteriors took over.  ABC Supply continued to pursue Mr. Sorensen for $119,000 of materials used by RBI on an account personally guaranteed by Mr. Sorensen when he opened Sorensen Roofing in 2012.

73.     As a result of RBI's breaches and failure to perform, Mr. Sorensen is owed back pay totaling more than $360,000 in W-2 wages from 2020 through 2022.

74.     In total, Mr. Sorensen's direct damages arising from RBI's conduct exceed $790,000.  This is exclusive of damages to Mr. Sorensen's reputation and Sorensen Roofing's brand, intellectual property, trade secrets, depreciation of equipment and materials, and lost business opportunities.  But for RBI's acquisition of Sorensen Roofing pursuant to the Amended Agreement, Sorensen Roofing would remain a profitable enterprise generating profits nearing or exceeding $1,000,000 annually.

## <u>CLAIMS FOR RELIEF</u>

### FIRST CLAIM FOR RELIEF
### Breach of Contract

75.     The allegations set for in paragraphs 1-74 are incorporated by reference.

76.     The Amended Agreement constituted a valid and binding contractual agreement between the Parties.

77.     Plaintiffs fully performed their obligations under the Amended Agreement.

78.     Defendants materially breached the Amended Agreement, as set forth above.

79.     As a direct and proximate result of Defendants' breaches of the Amended Agreement, Plaintiffs suffered damages, including those set forth in paragraphs 67-74 above, which are continuing, in an amount to be determined at trial.  Plaintiffs are entitled to all direct, indirect, consequential, special, and compensatory damages sustained as a result of Defendants' breaches, including attorney's fees and costs paid or incurred by Plaintiffs in bringing and maintaining this action, as allowed by contract or otherwise by law.

## SECOND CLAIM FOR RELIEF
### Breach of Duty of Good Faith and Fair Dealing

80.     The allegations set for in paragraphs 1-74 are incorporated by reference.

81.     The Amended Agreement constituted a valid and binding contractual agreement between the Parties.

82.     The Amended Agreement includes an implied duty of good faith and fair dealing.

83.     Defendants failed to act in good faith and to deal fairly with Plaintiffs in performing under the Amended Agreement, as set for in greater detail in paragraphs 1-74, above.

84.     Plaintiffs relied upon the covenant of good faith and fair dealing in their performance under the Amended Agreement, and reasonably and justifiably expected

Defendants would act in Plaintiffs' best interest and not materially breach the Amended Agreement or other act in a manner to cause substantial harm to Plaintiffs.

85.     As a direct and proximate result of Defendants' breaches of the Amended Agreement and its implied covenant of good faith and fair dealing, Plaintiffs suffered damages, including those set forth in paragraphs 67-74 above, which are continuing, in an amount to be determined at trial.  Plaintiffs are entitled to all direct, indirect, consequential, special, and compensatory damages sustained as a result of Defendants' breaches, including attorney's fees and costs paid or incurred by Plaintiffs in bringing and maintaining this action, as allowed by contract or otherwise by law.

### THIRD CLAIM FOR RELIEF
### Fraud in the Inducement / Misrepresentation

86.     The allegations set for in paragraphs 1-74 are incorporated by reference.

87.     Defendants misrepresented material facts at the time of contract, including facts relating to their intent to perform, their intent to act in good faith and deal fairly with Plaintiffs, the status of their contracts and relationships with third parties, and their overall financial condition.

88.     At the time of their representations, Defendants knew the representations were false or they did not know whether the representations were true or false.

89.     Defendants made the representations with the intent that Plaintiffs would rely on the representations.

90.     Plaintiffs justifiably relied on Defendants' representations, which induced Plaintiffs to enter into the Agreement and Amendment, perform under the Amended Agreement, and delay their pursuit of this action.

91.     This reliance caused damages to Plaintiffs.

92.     As a direct and proximate result of Defendants' fraud in the inducement and intentional and/or negligent misrepresentations, Plaintiffs suffered damages, including those set forth in paragraphs 67-74 above, which are continuing, in an amount to be determined at trial.  Plaintiffs are entitled to all direct, indirect, consequential, special, and compensatory damages sustained as a result of Defendants' fraud in the inducement and intentional and/or negligent misrepresentations, including attorney's fees and costs paid or incurred by Plaintiffs in bringing and maintaining this action, as allowed by contract or otherwise by law.

### FOURTH CLAIM FOR RELIEF
### Tortious Interference with Contract

93.     The allegations set for in paragraphs 1-74 are incorporated by reference.

94.     Plaintiffs had contracts with third parties, including but not limited to contracts with certain employees, contractors, customers, vendors, suppliers, lessors, and financial institutions.

95.     Defendants knew or reasonably should have known of Plaintiffs' contracts.

96.     Defendants intentionally placed Plaintiffs in a position of being unable to perform under the contracts or otherwise impeded third parties from performing under the contracts, thus interfering with the performance of the contracts.

97.    Defendants' interference was improper.

98.    As a direct and proximate result of Defendants' tortious interference with Plaintiffs' third-party contracts, Plaintiffs suffered damages, including those set forth in paragraphs 67-74 above, which are continuing, in an amount to be determined at trial. Plaintiffs are entitled to all direct, indirect, consequential, special, and compensatory damages sustained as a result of Defendants' interference, including attorney's fees and costs paid or incurred by Plaintiffs in bringing and maintaining this action, as allowed by contract or otherwise by law.

## FIFTH CLAIM FOR RELIEF
### Tortious Interference with Prospective Business Advantage

99.    The allegations set for in paragraphs 1-74 are incorporated by reference.

100.    Defendants intentionally and improperly interfered with Plaintiffs' prospective contractual relations.

101.    Defendants' actions prevented Plaintiffs from acquiring prospective relations including customer contracts and employment agreements.

102.    As a direct and proximate result of Defendants' tortious interference with Plaintiffs' prospective contractual relations and business advantage, Plaintiffs suffered damages, including those set forth in paragraphs 67-74 above, which are continuing, in an amount to be determined at trial.  Plaintiffs are entitled to all direct, indirect, consequential, special, and compensatory damages sustained as a result of Defendants' interference, including attorney's fees and costs paid or incurred by Plaintiffs in bringing and maintaining this action, as allowed by contract or otherwise by law.

## SIXTH CLAIM FOR RELIEF
### Conversion

103.   The allegations set for in paragraphs 1-74 are incorporated by reference.

104.   Defendants, with Plaintiffs' authorization, have exercised ownership and control over Plaintiffs' property consisting of, in part, business equipment, vehicles, tools and materials, trade secrets, and proprietary information.

105.   Plaintiffs have made demands for the return of all property but Defendants have refused to return it.

106.   As a direct and proximate result of Defendants' conversion of Plaintiffs' property, Plaintiffs suffered damages, including those set forth in paragraphs 67-74 above, in an amount to be determined at trial.  Plaintiffs are entitled to all direct, indirect, consequential, special, and compensatory damages sustained as a result of Defendants' conversion, including attorney's fees and costs paid or incurred by Plaintiffs in bringing and maintaining this action, as allowed by contract or otherwise by law.

## SEVENTH CLAIM FOR RELIEF
### Misappropriation of Trade Secrets

107.   The allegations set for in paragraphs 1-74 are incorporated by reference.

108.   Prior to entering into the Agreement and Amendment, Plaintiffs held trade secrets as defined by A.R.S. § 44-401.

109.   Plaintiffs' trade secrets afforded Plaintiffs a demonstrable competitive advantage.

110.    Defendants misappropriated Plaintiffs' trade secrets by acquiring the same with actual or constructive knowledge they were acquiring the trade secrets by improper means.

111.    Defendants misappropriated Plaintiffs' trade secrets by using or continuing to use the same without Plaintiffs' consent when they knew or should have known the trade secrets were acquired by improper means, accident, or mistake.

112.    As a direct and proximate result of Defendants' misappropriation of trade secrets, Plaintiffs suffered damages, including those set forth in paragraphs 67-74 above, in an amount to be determined at trial.  Plaintiffs are entitled to all direct, indirect, consequential, special, and compensatory damages sustained as a result of Defendants' misappropriation of trade secrets, including attorney's fees and costs paid or incurred by Plaintiffs in bringing and maintaining this action, as allowed by contract or otherwise by law.

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment

113.    The allegations set for in paragraphs 1-74 are incorporated by reference.

114.    Benefits, including use and enjoyment of Plaintiffs' business assets and capital contributions, were conferred on Defendants to the detriment of, at the expense of, or on behalf of Plaintiffs, including loss of income, depreciation and diminution in value of assets, and harm to reputation.

115.    These benefits were appreciated by Defendants.

116.    These benefits were accepted by Defendants under circumstances that retaining the benefits without paying their fair value would be inequitable.

117.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs suffered damages, including those set forth in paragraphs 67-74 above, in an amount to be determined at trial.  Plaintiffs are entitled to all direct, indirect, consequential, special, and compensatory damages sustained as a result of Defendants' unjust enrichment, including attorney's fees and costs paid or incurred by Plaintiffs in bringing and maintaining this action, as allowed by contract or otherwise by law.

### NINTH CLAIM FOR RELIEF
**Civil Conspiracy**

118.    The allegations set for in paragraphs 1-74 are incorporated by reference.

119.    Defendants entered into an unlawful civil conspiracy, pursuant to which they agreed, by words and by conduct, upon a course of action to accomplish unlawful objectives.

120.    These unlawful objectives included, but are not limited to, bad faith breach of contract, tortious interference with contract, misappropriation of trade secrets, and conversion.

121.    In furtherance of Defendants' unlawful civil conspiracy and unlawful course of conduct, Defendants engaged in unlawful actions which were performed to accomplish an unlawful goal.

122.    Such unlawful course of action included inducing Plaintiffs to enter into the Agreement and the Amendment knowing Defendants had no intention of performing

under the Amended Agreement, inducing Plaintiffs to underwrite operating expenses for RBI, inducing Plaintiffs to enter into a contract for the sale of units of RBH to a third party when Defendants did not intend to issue the units, misappropriating trade secrets, and the use and enjoyment of Plaintiffs' assets following material breach of the Amended Agreement and over Plaintiffs' objection.

123.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs suffered damages, including those set forth in paragraphs 67-74 above, in an amount to be determined at trial.  Plaintiffs are entitled to all direct, indirect, consequential, special, and compensatory damages sustained as a result of Defendants' civil conspiracy, including attorney's fees and costs paid or incurred by Plaintiffs in bringing and maintaining this action, as allowed by contract or otherwise by law.

### TENTH CLAIM FOR RELIEF
### Injunctive Relief

124.    The allegations set for in paragraphs 1-74 are incorporated by reference.

125.    Plaintiffs request the issuance of an injunction preventing and prohibiting Defendants from any further use of Plaintiffs' assets, including any and all assets, trade secrets, proprietary information, or other property which were to be conveyed pursuant to the Amended Agreement.

126.    Plaintiffs request the issuance of an injunction preventing and prohibiting Defendants from selling, transferring, or otherwise encumbering Plaintiffs' assets, including any and all assets, trade secrets, proprietary information, or other property which were to be conveyed pursuant to the Amended Agreement.

127.   Any further use of Plaintiffs' assets, including any and all assets, trade secrets, proprietary information, or other property which were to be conveyed pursuant to the Amended Agreement, will result in irreparable harm to Plaintiffs, including substantial, irreversible harm to Plaintiffs' business, professional reputation and good will, and personal reputation in the community.

128.   Any sale, transfer, or encumbrance of Plaintiffs' assets, including any and all assets, trade secrets, proprietary information, or other property which were to be conveyed pursuant to the Amended Agreement, will result in irreparable harm to Plaintiffs, including substantial, irreversible harm to Plaintiffs' business.

129.   The harm that would result to Plaintiffs from Defendants' use, sale, transfer or encumbrance of Plaintiffs' assets, including any and all assets, trade secrets, proprietary information, or other property which were to be conveyed pursuant to the Amended Agreement, outweighs the cost, harm, or inconvenience to Defendants if an injunction is issued.

130.   Plaintiffs intend to promptly move for entry of a preliminary injunction pursuant to Fed. R. Civ. P. 65 to maintain the status quo during the pendency of this action.

131.   Plaintiffs have no adequate remedy at law.

132.   By reason of the foregoing, Plaintiffs are entitled to injunctive relief as set forth above.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury of any and all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Mile High Restoration Inc. d/b/a Sorensen Roofing & Exteriors, G.C. and Brian Sorensen respectfully request judgment be entered in Plaintiffs' favor and against Defendants for any and all damages, attorney's fees and costs, pre- and post-judgment interest at the highest allowable rate, and for such other and further relief that the Court deems just and appropriate.

RESPECTFULLY SUBMITTED this 5th day of May, 2022.

COAN, PAYTON & PAYNE, LLC


*/s Fritz W. Ganz*
Fritz W. Ganz, #028990
999 18th Street
South Tower | Suite 1500S
Denver, Colorado 80202
Phone: (303) 861-8888
Email: fganz@cp2law.com

**ATTORNEYS FOR PLAINTIFFS**

Plaintiffs' Addresses:
Brian Sorensen
5937 West 4th Street
Greeley, Colorado 80634

Mile High Restoration Inc.
c/o Brian Sorensen
5937 West 4th Street
Greeley, Colorado 80634

## VERIFICATION OF PLEADING

I, Brian Sorensen, declare:

1.      I am, and at all time relevant was, President and Owner of Mile High Restoration Inc. d/b/a Sorensen Roofing & Exteriors, G.C.

2.      I have read the foregoing Verified Complaint and Jury Demand and know the contents thereof.

3.      The same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true.

4.      I declare or certify under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of May, 2022, at Greeley, Colorado;

By: _____

Brian Sorensen

Individually and as President and Owner of Mile High Restoration Inc.

STATE OF COLORADO      )
                       )  ss.
COUNTY OF WELD         )

Subscribed and sworn before me by Brian Sorenson on **May 4, 2022**.

My commission expires: 4/24/2024

(SEAL)    **KERRY ANNE MOORE**
          **NOTARY PUBLIC**
          **STATE OF COLORADO**
          **NOTARY ID 20004012194**
          **MY COMMISSION EXPIRES APR 24, 2024**

_____
Notary Public